OLSON v. WOOD.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—RECORD—EXTRANEOUS TESTIMONY.

Question as to whether or not trial court should have taken into consideration extraneous information, not contained in the record, in reaching its decision as to whether claimant had sustained burden of showing himself entitled to payment of claim by receiver is not determined, where case is heard *de novo* by Supreme Court and its decision is based entirely on record before it.

2. PARTNERSHIP—DISSOLUTION—CLAIM AGAINST FIRM.

Disallowance of partner's claim for rivets which he furnished for use in the making of a toggle clamp *held*, proper under record submitted in proceeding for dissolution of partnership.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted January 3, 1951. (Docket No. 42, Calendar No. 44,976.) Decided March 1, 1951.

In matter of receivership of Oakwood Manufacturing Company. John Olson presented his claim for allowance. Claim resisted by Aura D. Nichols and another. Aina E. Wood, executrix of estate of Justis Wood, deceased, substituted as party defendant. Claim allowed in part. Plaintiff appeals. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error, § 815.

*Jarl A. Andeer,* for plaintiff.

*Edwin J. Mercer* and *Slyfield, Hartman, Reitz & Tait,* for defendant Nichols.

*Edward N. Barnard,* for defendant Wood.

North, J. The bill of complaint herein was filed to secure dissolution of Oakwood Manufacturing Company, a limited copartnership, which at the inception of this litigation was composed of plaintiffs and Justis Wood. During the pendency of the suit Wood died and the executrix of his estate was substituted as defendant. Dissolution of the partnership was agreeable to all parties, receivers were appointed to carry on the business which in due course was sold. In the receivership proceedings plaintiff Olson filed a petition for allowance of a claim in the amount of $10,359.97. Its allowance was resisted by the other parties to this suit. The matter was heard by the circuit judge on testimony taken in open court. He allowed Olson's claim to January 1, 1946, in the amount of $785.94, but disallowed the balance. Olson has appealed.

The Oakwood Manufacturing Company manufactured tools, machine parts, jigs and fixtures. Formerly the partnership was composed of Olson and Wood, and a third person who withdrew from the firm in 1944. Thereafter plaintiff Aura D. Nichols in November, 1944, became a member of the partnership with Olson and Wood, although the formal agreement for the partnership was not executed until January 2, 1945. Each of the 3 had an equal interest. Since August, 1941, the Oakwood Manufacturing Company manufactured for Olson, in large numbers, toggle clamps. Olson had designed these clamps and had patents covering certain portions of them. Manufacturing them required the use

of steel rivets. The partnership could not obtain steel, because of a priority requirement which it did not possess; but Olson, who had a priority right to purchase steel, was able to obtain the rivets used in manufacturing the clamps, and he furnished the rivets to the partnership. The situation was met by an oral arrangement or agreement between the then (1942) members of the partnership. Plaintiff Olson claims he was to be paid at cost to him for the rivets furnished by him; and it is for such payments Olson made his claim in the receivership for $10,359.97. The other partners resisted allowance of this claim, asserting Olson, at least subsequently to January 1, 1946, was to furnish the rivets at his own expense. Whether Olson's claim for rivets furnished after January 1, 1946, should be allowed is the sole issue presented on this appeal.

Olson's petition for allowance of his claim was filed in May, 1949. The manufacturing for Olson of these toggle clamps had been continuing from 1941, or at least from sometime in 1942. Over all this period Olson had always paid the partnership in full for the manufactured clamps as they were shipped. Up until June 30, 1945, he did not present a bill to the partnership or demand payment for the rivets he had furnished. Olson testified:

"The company paid me that accumulated rivet bill up to and including June 30, 1945, from the beginning of the partnership. I had never placed a bill for them before. This discussion (seemingly referring to a discussion in reference to paying Olson for rivets furnished up to June 30, 1945) pertained to the rivet bill, and it was agreed that I was to be paid and was paid the accumulated bill at that time. I did not have any other discussion with Mr. Nichols pertaining to this subject matter of toggle clamps at that time. The next discussion took place in April, 1946, and that was at the office of the company. We dis-

cussed the price of the clamps. Mr. Nichols claimed at that time they weren't making enough profit on the clamp business. I said, 'If you show me the cost of it, and so forth, you are not making enough profit, we may adjust the price.' In other words, he wanted at that time to revise the then existing understanding but at that meeting nothing was agreed on.''

Just previous to giving the above testimony, Olson had testified:

"When Mr. Nichols entered the partnership, I had a discussion with him in the beginning of 1945 respecting the Oakwood Manufacturing Company manufacturing some of my clamps."

After January 1, 1946, to which date the court allowed Olson's claim, no payments for rivets were made, and from that date to the inception of the receivership in 1949, Olson did not submit any invoices to the company or to either of the other partners for rivets, and as to that period he testified: "I know of no notation on the books that the company owed me any amount for rivets." But in behalf of Olson it is emphasized as to other items of business between the members of the firm there was similar laxity. For example, Olson owned the real estate occupied by the partnership, but for the years 1946 to 1948, inclusive, during which period there was trouble or lack of agreement between the partners as to the rent, no entries of rents, which the court in this suit found were due Olson, appear in the firm's books of account.

As bearing further upon the merits of Olson's claim for the period subsequent to January 1, 1946, we quote the following from his cross-examination:

"*Q.* You do remember that Mr. Nichols did make a time study and cost-of-material study of the cost of the clamp?
"*A.* In 1946.

"*Q*. It is your recollection now that that was in the early part of 1946?

"*A*. Yes, sir.  *  *  *

"*Q*. Do you remember it was the claim of Mr. Nichols and Mr. Wood that they had made a study of the cost of labor and material that went into that clamp, and that if the clamp were furnished you at the same price that it had been furnished in the past, the partnership would be losing money on it?

"*A*. That was claimed by Mr. Nichols.  *  *  *

"*Q*. Put it this way: Don't you remember Wood telling you in the presence of Mr. Nichols, 'We would be losing money on every clamp we made if we paid for the rivets. Therefore, we won't continue manufacturing them for you unless you furnish the rivets yourself without cost to the partnership'?

"*A*. There was no statement made by Mr. Wood. All those statements were made by Mr. Nichols.

"*Q*. In any event, you do know that sometime, which time you place as April of 1946, there was a discussion with reference to the cost of the clamp?

"*A*. Yes, sir.

"*Q*. And an objection on the part of one or the other of the partnership that they were losing money on the clamp at the price?

"*A*. Yes.

"*Q*. And that thereafter they continued furnishing the clamp at the same price from then up until the time the partnership was dissolved?

"*A*. Yes."

The partnership employed an auditor, who every 6 months made an audit of the partnership's accounts. It was accessible to all members of the firm. On cross-examination Olson also testified:

"In every report (audit) there was an analysis of my account with the partnership and on none of those was there any showing of any amount due from the partnership to me for rivets. Mr. Childs made an audit as of April 30, 1949, and a copy of that was submitted to me and to Mr. Nichols—or at least, it was

submitted to me.  *  *  *  In that audit there appears an analysis of an account with John Olson.  I do not remember that there was an analysis of my account in that audit."

When the audit was produced in evidence it appeared that it contained an analysis of Olson's account, but there was nothing showing any credit due Olson for rivets.  Also in this audit there was a schedule of the firm's bills and accounts payable as of June 30, 1948, but this schedule contained no entry showing any amount due Olson.  Further the income tax returns, prepared for the firm by its auditor, which reflected the profits and losses of the company as shown by its books, contained no reference to any indebtedness due from the partnership to Olson; and on his cross-examination Olson testified: "I didn't mention to the attorney for the receivers any claim for rivets at the same time I made à claim for rent."

The record discloses that the "payment" of his charge for rivets on and up to June 30, 1945, amounting to $10,022.78, as above noted in quoting from his testimony, was accomplished by "dividing" it between Olson, Wood and the former partner who had retired from the partnership.  Olson testified: "Nichols did not pay any part of the $10,022.78." He denied that at that time or shortly thereafter Nichols protested that the price charged to Olson for the clamps was too low if Olson was to be allowed a counter-charge for the rivets furnished by him. The firm's bookkeeper testified relative to the claimed "payment" of Olson's $10,022.78 charge for rivets was "by bookkeeping entries.  *  *  *  It was deducted from his accounts receivable account in the audit, I believe June 30, 1945, and paid that way." On re-direct examination, Olson testified:

"I had no knowledge of charging off the $10,022.78 for accumulated rivet bills to myself, Mr. Wood and    *    *    *    (the former partner who had retired) until I saw the report (the audit of June 30, 1945).    *    *    *    I haven't accepted that charge-off at any time. I don't know who directed that this be done.    *    *    *    I had no hand in it; I knew nothing about it until he actually came out with the audit. Mr. Nichols' statement with regard to this when I confronted him with it was, 'Well, I don't feel like paying rivet bills.' "

The foregoing discloses to some extent the unsatisfactory condition and the indefiniteness of the record, thus far made in this case, pro and con, as to whether Olson's claim for rivets furnished to the partnership after January 1, 1946, should be allowed; and we deem it unnecessary to quote further in that respect from Olson's testimony.

Aura D. Nichols was called as a witness by Olson and examined by the latter's attorney, and later by Nichols' attorney. On being questioned by Olson's attorney, Nichols testified:

"I knew about the bill (for $10,022.78) by June 30, 1945, but I did not understand that the bill included all accumulated rivet bills, including the 7½ months that I was a partner.    *    *    *    I recall other discussions at other times with respect to this rivet bill about February of the year 1945.    *    *    *    I didn't know until February, 1945, that there was an agreement among these partners which had gone on for years.    *    *    *

"Q. I will refer you to Mr. McKenney's recommendations filed with this court in which he states, on page 2: 'The June 30, 1945, statement had been accepted and acted upon by the parties for several years, and Mr. Nichols finally agreed that it was an account stated and would bind as to rivets up to that time. He further stated that he had agreed that the Oakwood Manufacturing Company should

pay for the rivets furnished by Mr. Olson to approximately January 1, 1946. The amount for rivets from June 30, 1945, the date of this account stated, to approximately January 1, 1946, is an additional $785.94.'

"*A.* That is right.

"*Q.* Does that truly represent what you agreed and accepted and admitted at that conference?

"*A.* That is right."

On being examined by his own attorney, Mr. Nichols further testified:

"As soon as we got this time study (in March or April, 1946), Mr. Wood and I immediately took it up with Mr. Olson and showed him where the clamp —we were losing money on this clamp without—not even furnishing the rivets.

"*Q.* Can you describe any clear-cut agreement that was arrived at then between Mr. Wood, Mr. Olson and yourself as to payment for rivets from then on?

"*A.* We talked about it for several times after— I would say about 2 months after that and Mr. Olson agreed to furnish the rivets. * * * It was during this same 2 months, Mr. Wood, along with myself, threatened to stop the clamp business if Mr. Olson didn't furnish the rivets.

"*Q.* All right. Now, that was your understanding at that time, that Mr. Olson then had agreed that he would furnish the rivets?

"*A.* That is right. * * *

"*Q.* And there remained an amount for rivets furnished during 1945, the balance of which was $785.94?

"*A.* That is right. * * *

"*Q.* And that amount for rivets furnished during 1945 continued to be a point of difference right up until the time of the meeting this spring out at the Oakwood Manufacturing Company?

"*A.* That is right. * * * Mr. Olson was the one who gave directions to the bookkeeper to make

up the invoices for clamps. 'Invoices' would be a bill to Mr. Olson that he owed so much money to Oakwood Manufacturing Company for so many clamps furnished him. On any of these invoices there never was any charge made by him as a contra-account for rivets furnished."

In addition to the question: "Did the preponderance of proofs in the case entitle claimant to payment," appellant's brief also submits the following question: "Should the court have taken into consideration extraneous information, not contained in the record, in reaching its decision?"

Regardless of the merits of appellant's contention in this particular, the matter becomes quite inconsequential on this appeal for the reason that we hear the case *de novo* and we have based our conclusion exclusively on the testimony contained in the record before us. After having so considered the appeal, we conclude that entirely apart from whether the circuit judge may have given consideration to matters as to which there was no testimony at the hearing of the case, he reached the right result. Under the record before us, disallowance of Olson's claim from which appeal was taken was properly decreed in the circuit court, and is affirmed. Aura D. Nichols and the executrix of the Justis Wood estate may have costs of this Court.

REID, C. J., and BOYLES, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.